### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| REDRICK WARD, | ) | CASE NO. 1:22-CV-00372 |
| | ) | |
| Plaintiff, | ) | JUDGE CHARLES E. FLEMING |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF EAST CLEVELAND, et al., | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendants. | ) | **ORDER** |

Before the Court is the Motion of Defendants, City of East Cleveland ("City"), Chief of Police Scott Gardner ("Chief Gardner"), and Officers Willie Warner-Sims, Kalin Berry, and Derek Gerstenberger ("Officers") (collectively, "East Cleveland Defendants"), for Summary Judgment against Plaintiff Redrick Ward ("Ward").  (ECF No. 31, PageID #584).  Ward timely opposed East Cleveland Defendants' Motion.  (ECF No. 33, PageID #702).  East Cleveland Defendants filed a Reply Brief in support of their Motion.  (ECF No. 34, PageID #767).  Defendant Nicholas Foti ("Foti"), a former East Cleveland police officer, filed a Response in Support of East Cleveland Defendants' Motion for Summary Judgment.  (ECF No. 40, PageID #787).  Foti later filed his own Motion for Summary Judgment against Ward, (ECF No. 49, PageID #909), to which Ward filed a timely response.  (ECF No. 52, PageID #1175).   East Cleveland Defendants renewed their Motion for Summary Judgment on February 11, 2025.  (ECF No. 54).  Ward has moved to strike East Cleveland Defendants' renewed motion because it was filed after the dispositive motion deadline. (ECF No. 59).  For the reasons below, East Cleveland Defendants' and Foti's Motions are **GRANTED IN PART AND DENIED IN PART**.  East Cleveland Defendants' Renewed Motion for Summary Judgment against Ward is **STRICKEN**.

Also before the Court is Ward's Motion for Summary Judgment.  (ECF No. 50).  East Cleveland Defendants and Foti respectively filed a response and opposition to Ward's Motion.  (ECF Nos. 55 & 56).  Foti also moved to Strike Exhibit A from Ward's Motion for Summary Judgment.  (ECF No. 56, PageID #1280).  For the reasons below, Ward's Motion for Summary Judgement is **GRANTED IN PART AND DENIED IN PART**.  Foti's Motion to Strike is **DENIED.**

## I.     FOTI'S MOTION TO STRIKE EXHIBIT A FROM WARD'S MOTION FOR SUMMARY JUDGMENT

Before the Court addresses the parties' Motions for Summary Judgment, the Court considers Foti's Motion to Strike Exhibit A from Ward's Motion for Summary Judgment.  Foti's Motion seeks to strike the body camera footage attached to Ward's Motion.  (ECF No. 59).  Ward first incorporated the video as "Exhibit A" to his Response to East Cleveland Defendant's Motion for Summary Judgment on August 5, 2024.  (ECF No. 33, Index of Exs., PageID #721).  On January 20, 2025, Ward reincorporated the same video as an exhibit to his own Motion for Summary Judgment.  (ECF No. 50-1, Index of Exs., PageID #1064).  On February 7, 2025, Ward filed the exhibit manually and stated that the video was served manually on all parties.  (ECF No. 53, Not. of Manual Filing, PageID #1249–50).

In his Motion to Strike, Foti argues he did not receive the video, that it is not a part of the record, and that it should be stricken.  (ECF No. 56, PageID #1282–83).  On March 3, 2025, Ward filed a response to Foti's Motion to Strike.  (ECF No. 57, PageID #1290).  Ward argues the video should not be stricken because its inclusion is not prejudicial to Foti; Foti reviewed the video (which is also publicly available) as part of his deposition, and Foti did not promptly notify Ward's counsel of any technical issues associated with the video.  (*Id.* at PageID #1291).

2

Foti's Motion is made under Fed. R. Civ. P. 12(f).  (*Id.* at PageID #1298).  Rule 12(f) provides that on a motion of a party, courts may strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  By its very terms, Rule 12(f) applies only to "pleadings"; given that Foti's Motion does not seek to strike any of the pleadings enumerated in Fed. R. Civ. P. 7(a), this motion is an improper vehicle to remove Ward's Exhibit A from the record.  However, the Court has the inherent authority to manage its docket, including striking filings in violation of its scheduling order or local rules.  *See, e.g.*, *Am. Civ. Liberties Union of Ky. v. McCreary Cnty.*, 607 F.3d 439, 451 (2010) ("[B]ased on the district court's power to manage its own docket, the court had ample discretion to strike Defendants' late renewed motion for summary judgment").

The Court declines to strike Ward's Exhibit A for two reasons.  First, the video attached as Exhibit A has been a part of the record since August, when Ward incorporated it as an exhibit to his response to East Cleveland Defendants' Motion for Summary Judgment.  (ECF No. 33-1, PageID #721).  Foti therefore had notice of Ward's reliance on this video five months before Ward filed his Motion for Summary Judgment.  (ECF No. 39, PageID #786).  Foti does not explain why he did not obtain the video from Ward (or its source, the City) before the discovery cutoff of December 18, 2024.  Moreover, when Ward used the video in opposition to East Cleveland Defendants' Motion for Summary Judgment, Foti expressed no concerns regarding receipt of the video then; to the extent that Foti was still obtaining new counsel in August 2024, he offers no reason his new counsel (whom he retained as of September 27, 2024) could not make this argument on his behalf in his Reply in Support of East Cleveland Defendants' Motion for Summary Judgment filed on October 28, 2024.  (*See* ECF No. 40).

Second, Foti's deposition testimony, given on December 9, 2024, includes his review of the very video at issue. (ECF No. 57, PageID #1291; ECF No. 50-4, PageID #1114–18). Foti's deposition occurred two weeks before the fact discovery cutoff, yet Foti did not try to obtain a copy of the video then either. Foti's repeated notice regarding Ward's plans to use this video coupled with his multiple opportunities to obtain the video before the discovery cutoff renders this objection untimely, and therefore, waived. Even if the Court decided Foti's objection *was* timely, given how long Foti knew about Ward's reliance on the video, Ward's use of Exhibit A in his Motion for Summary Judgment cannot be seen as unfair or prejudicial. Accordingly, Foti's Motion to Strike is **DENIED**.

## II.   EAST CLEVELAND DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

Besides requiring the parties to file discovery disputes no later than December 18, 2024, the Court also set a second dispositive motions deadline of January 20, 2025. (ECF No. 39, PageID #786). After that date, on February 11, 2025, East Cleveland Defendants filed a Renewed Motion for Summary Judgment. (ECF No. 54). Ward moved to strike East Cleveland Defendants' Renewed Motion on March 4, 2025, because it was untimely. (ECF No. 59, PageID #1297). The same day, East Cleveland Defendants argued in opposition that they should be allowed to incorporate new material into their original motion "as a matter of retributive justice", apparently because Ward filed his own (timely) dispositive motion.[1] (ECF No. 60, PageID #1303).

East Cleveland Defendants filed their Renewed Motion for Summary Judgment 22 days after the dispositive motion deadline. They did not seek leave to renew their Motion; nor did they

---

[1] East Cleveland Defendants previously moved to strike Ward's Motion for Summary Judgment, claiming that it had been filed after the dispositive motion deadline. (ECF No. 51, PageID #1168). The Court denied that motion in a non-document order on January 28, 2025, because Ward filed his Motion timely under the Updated Case Management Plan (ECF No. 39), which did not "restrict the filing of additional dispositive motions to Defendant Foti alone." (Non-document Order Denying ECF No. 39 (Jan. 28, 2025).

ask for an extension of time to file same. It is therefore untimely.  Ward's Motion to Strike is **GRANTED**, and East Cleveland Defendants' Renewed Motion for Summary Judgment (ECF No. 54) is **STRICKEN**.

### III.  FACTUAL BACKGROUND APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

#### A.  The Traffic Stop

On April 1, 2020, Officers and Foti pursued Ward after another officer not named as a defendant here allegedly saw Ward driving on the sidewalk.  (ECF No. 31-1, Police Rpt., PageID #607).  Ward was going around 30 miles per hour when Officers and Foti activated their lights and sirens.  (*Id.*; ECF No. 33, Ex. A, Body Cam., 0:04–0:05).  Body camera footage recorded during the incident suggests that Ward pulled over within about 12 to 14 seconds of their pursuit, although the footage does not establish when the lights and sirens were activated.  (ECF No. 33, Ex. A, 0:12–0:14).  After Ward pulled over, Officers and Foti approached his vehicle with their guns drawn.  (*Id.* at 0:15–0:20).  Ward claims that he drove away out of fear for his safety.  (ECF No. 33, PageID #706, 713; ECF No. 50, PageID #1045).

Officers and Foti again pursued Ward, and he pulled over a second time.  (ECF No. 33, Ex. A, 0:28–1:47).  Foti used his baton to break part of Ward's driver's-side window, shattering glass onto Ward.  (*Id.* at 1:55–2:00).  Ward drove away again, and Officers and Foti pursued him a third time before using stop sticks to deflate his tires. (*Id.* at 2:00–2:22).  Ward locked his car doors and stayed inside his car, causing Officers and Foti to (1) finish breaking the driver's side window to unlock the driver' side door, and (2) open the car door and wrestle Ward out of his car onto the ground.  (*Id.* at 2:50–3:00).  Ward appeared to stop resisting and lied prone.  (*Id.* at 3:00–3:02).  Officers Warner-Sims and Berry held Ward face down on the ground with the hood of Ward's sweatshirt covering his head; Officer Gerstenberger held Ward by his legs.  (*Id*. at 3:03-3:17).

Even though Ward no longer appeared to be resisting, the Officers kicked and tased Ward until Officer Gerstenberger pulled Ward's hands behind his back and held them there.  (*Id.*).  Ward can be heard screaming as Officers and Foti beat him.  (*Id.*).

While Officers and Foti had Ward prone on the ground with his hands held behind his back, Foti stomped on Ward's head twice.  (*Id.* at 3:18–3:20).  Officer Warner-Sims pushed Foti's leg away to stop the stomping.  (*Id.* at 3:15–20; 31-1, Police Rpt., PageID #611).  While Officer Berry held Ward down with his knee, Foti tased Ward again; Ward shouted, "Stop!  Stop!  Stop!"  (*Id.* at 3:21–3:28).  In response, Officer Berry—with his knee still pressed into Ward's shoulders—began punching Ward in the back and neck area.  (*Id.* at 3:29–3:33).  Ward sustained an abrasion on his chin and a laceration on his cheek from broken glass.  (ECF No. 1, PageID #7–8).

Ward was arrested and charged with having physical control of a vehicle while under the influence (a non-moving traffic violation), failure to comply with the lawful order of police, and fleeing.  (ECF No. 31-2, East Cleveland Mun. Ct. Case No. 20TRD01249 Docket, PageID #612).  The City ultimately dismissed the charge for physical control while under the influence.  (*Id.*).  Ward's charges were further amended on June 3, 2020; the City removed the charges for failure to comply and fleeing law enforcement and changed them to speeding and having an expired license plate.  (*Id.*).  Ward pleaded no contest to these new charges, and the court found him guilty of those two offenses on June 3, 2020.  (*Id.*).

A "Use of Force" report is normally completed after the City's police officers use the type of force described in Ward's Complaint, but the record reveals neither Officers nor Foti documented this incident in accordance with the City's policy.  (ECF No. 33-5, East Cleveland Police Dep't Div. Internal Aff. Compl. #21-004, PageID #615).  Because no report was filed, the City did not investigate the circumstances of Ward's arrest until one year later, after Ward hired

counsel and gave body-camera footage of his arrest to television media.  (*Id.*).  This was the second incident in which Foti did not complete the "Use of Force" form during his employment with the City, having been disciplined previously for the same behavior.  (*Id.* at PageID #616; ECF No. 31-5, Ltr. from Cmdr. W. Mitchell to Sgt. R. Bailey, PageID #680).  After the City's investigation, the City charged Foti with violating ECP Policy 119: Standards of Conduct (Class II Offense).  (ECF No. 31-4, PageID #615).  The charges were sustained, and Foti was terminated.  (ECF No. 31-3, Ltr. from East Cleveland Mayor B. King to Foti, PageID #614).  Foti filed a grievance with the Police Union regarding his termination, prompting his rehire.  (ECF No. 31, PageID #587; ECF No. 31-7, Ltr. from F.O.P. Counsel to W. Hemmons & M. Piotrowski, PageID #697).

Foti was charged with Felonious Assault (F2) and Attempted Felonious Assault (F3) in connection with Ward's arrest.  (ECF No. 50-4, Foti Dep., PageID #1112; *see* ECF No. 22, Mot. to Stay, ECF No. 446 (informing the Court that Foti was subject to criminal proceedings in the matter of *State of Ohio v. Nicholas Foti* (Cuyahoga C.P. No. CR-23-679084-A); ECF No. 22-2, Indictment, PageID #461).  The State of Ohio reduced those charges to misdemeanor assault in exchange for Foti's guilty plea.  (ECF No. 50-4, PageID #1112; *see State of Ohio v. Nicholas Foti*, Cuyahoga C.P. No. CR-23-679084-A (Nov. 27, 2023)).

Ward asserts that the City has a pattern of unconstitutional conduct, and that both the City and Chief Gardner are responsible for the training, customs, and conduct of the police officers they employ.  (ECF No. 1, PageID #4–5).  Ward's Complaint cites several instances of the City's police officers engaging in deadly car chases and brutalizing local citizens during 2021.  (*Id.*).  In his Response to East Cleveland Defendant's Motion for Summary Judgment, Ward relies on East Cleveland Police Commander Todd Carroscia's deposition testimony to evince discrepancies between the City's use of force policy and that policy's application.  (ECF No. 33, PageID #711).

In his Motion for Summary Judgment, Ward further relies on officer misconduct records and Foti's own testimony about his training in East Cleveland.  (ECF No. 50, PageID #1061–62).

### B.  Procedural History

On March 7, 2022, Ward filed this civil rights action under 42 U.S.C. §§ 1983 and 1988 against East Cleveland Defendants and Foti.  (ECF No. 1, Compl., PageID #2–3).  Ward alleges Officers and Foti used unreasonable and excessive force and committed assault, battery, and intentional infliction of emotional distress when they arrested him.  (ECF No. 1, PageID #12–14).  Ward also alleges each officer had a duty to intervene to prevent the abuse he suffered, and that Officers and Foti breached that duty.  (*Id.* at PageID #14–15).  Along with these claims, Ward alleges the City and Chief Gardner are liable for maintaining customs that violated his constitutional rights.  (*Id.* at PageID #15–16).  Ward also claims that the City and Chief Gardner failed to adequately train, supervise, and discipline their officers, and that they should be vicariously liable for Officers' and Foti's assault and battery against Ward.  (*Id.* at PageID #14–17).

Now on summary judgment, East Cleveland Defendants argue that the Court should grant judgment in their favor on the whole of the Complaint because each is entitled to qualified immunity.  (ECF No. 31, PageID #584).  Ward opposed East Cleveland Defendants' motion, claiming that Officers and Foti are not entitled to qualified immunity because the force they used during his arrest was excessive as a matter of law.  (ECF No. 33, PageID #705).  Ward argues that East Cleveland Defendants did not meet their burden of showing the City and Chief Gardner enforced the police department's use-of-force policy and its reporting and training requirements.  (ECF No. 33, PageID #705).  East Cleveland Defendants filed a reply reasserting that they are entitled to qualified immunity.  (ECF No. 34, PageID #771).  Foti also responded, largely endorsing

8

East Cleveland Defendant's Motion, but disputing that he acted outside the scope of his employment when he arrested Ward.  (ECF No. 40, PageID #787).

Foti later filed his own Motion for Summary Judgment.  (ECF No. 49, PageID #909).  He argues that there is no genuine issue of material fact concerning the claims Ward has levelled against him: excessive force and failure to intervene, as well as assault, battery, and intentional infliction of emotional distress.  (*Id.* at PageID #913).  Foti also asserts that he is entitled to qualified immunity.  (*Id.*).  In response, Ward argues that Foti, like East Cleveland Defendants, is not entitled to qualified immunity, and that there is sufficient evidence in the record to show, at the very least, a genuine dispute of material fact for trial.  (ECF No. 52, PageID #1178).

Ward's Motion for Summary Judgment argues that the record lacks any genuine dispute of material fact related to Counts I–II and IV–VI of his Complaint, each of which should be decided in his favor.  (ECF No. 50, PageID #1040).  Ward claims that Officers and Foti engaged in unreasonable and excessive force and failed to intervene to prevent the violation of his constitutional rights, making them liable to him not only under 42 U.S.C. § 1983, but also for the intentional torts of assault and battery.  (ECF No. 50, PageID #1054–56).  Ward also argues there is no genuine dispute of material fact as to the City's and Chief Gardner's maintenance of a custom giving rise to the constitutional violations committed against him or their failure to adequately train their officers.  (*Id.* at PageID #1059–62).

Both East Cleveland Defendants and Foti opposed Ward's Motion.  (ECF Nos. 55 & 56). East Cleveland Defendants argue that Ward has not provided sufficient evidence to show a departmental "custom" led to a violation of his constitutional rights or that inadequate training led to the alleged violations.  (ECF No. 55, PageID #1275–77).  Foti's opposition argues that there is a genuine dispute of material fact as to whether Foti stomped on Ward's head or otherwise engaged

in unreasonable or excessive force, assault, or failed to intervene, particularly given Ward's flight from the scene.  (ECF No. 56, PageID #1284–88).  On reply, Ward counters that the video of the encounter contradicts Foti's characterization of the facts.  (ECF No. 57, PageID #1292).  Ward argues that, while he did flee, that flight does not justify Foti's unreasonable and excessive force after Ward stopped resisting and, due to his incapacitation, could not have continued to resist.  (*Id.* at PageID #1292–93).

## IV.    SUMMARY JUDGMENT MOTION STANDARD

Federal Rule of Civil Procedure 56(a) provides that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A party making or opposing a Rule 56 motion must support her assertion that "a fact cannot be or is genuinely disputed" by

> citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The Court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990).  When the parties disagree about facts recorded on video, however, courts "views the facts in the light depicted by the videotape."  *Cunningham v. Shelby Cnty., Tenn.*, 994 F.3d 761, 763 (6th Cir. 2021) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).  Indeed, a factual dispute cannot be "genuine" when one of the parties' accounts of the facts is "blatantly contradicted" by a video recording.  *Scott*, 550 U.S. at 380.

10

A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. Generally, "[c]redibility judgments and weighing of the evidence are prohibited." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999). At the same time, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

The moving party has the burden of showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). The movant can meet this burden by either (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* If the moving party meets its burden, then the non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Zinn v. United States*, 885 F. Supp. 2d 866, 871 (N.D. Ohio 2012) (quoting *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992)). Rather, the nonmovant must point to specific facts in the record that create a genuine issue of material fact for trial. *Id.* (citing *Fulson*, 801 F. Supp. at 4).

## V. DISCUSSION

### A. Title 42 U.S.C. § 1983 Standard

Ward brings his civil rights claims against Defendants under 42 U.S.C. § 1983. Section 1983 confers a private right of action upon individuals to enforce rights secured by the Constitution and the laws of the United States. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002). To prove a

11

claim under 42 U.S.C. § 1983, a plaintiff "must establish . . . (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that he was subjected to or caused to be subjected to this deprivation by a person acting under the color of state law." *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).[2]

### B.    The Color of State Law Requirement

While neither party disputes that Officers acted under color of state law during Ward's arrest, East Cleveland Defendants argue that Foti did not.  (ECF No. 31, PageID #585).  Foti denies this.  (ECF No. 40, PageID #788).

Police conduct unsupported by any indicia of state authority falls outside the scope of a police officer's duties and therefore does not occur under color of state law.  *Burris v. Thorpe*, 166 F. App'x 799, 802 (6th Cir. 2006).  An officer who abuses or exceeds his recognized authority may still act under color of law, so long as he intends to act in an official capacity.  *Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st Cir. 1999) (holding that, where two off-duty police officers intervened in a bar fight, there was a question of material fact about whether their conduct was under color of state law).

Here, while East Cleveland Defendants claim that Foti acted outside the scope of his employment when he stomped on Ward's head, they do not contest that he was on duty at the time of the incident.  (ECF No. 40, PageID #788).  He was uniformed and acted in concert with the other uniformed, on-duty Officers.  (ECF No. 33, Ex. A).  The Cuyahoga County Common Pleas Court grand jury also determined that Foti acted under color of state law when it found sufficient

---

[2] East Cleveland Defendants state that standards arising under *Heck v. Humphrey*, 512 U.S. 477 (1994), and *Rooker-Feldman* doctrine, *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923); *D.C. Ct. Appeals v. Feldman*, 460 U.S. 462 (1983), apply to Ward's § 1983 claims.  (ECF No. 34, PageID #770–71).  They do not for two reasons.  First, Ward is not seeking to recover damages for an unconstitutional conviction or imprisonment.  (ECF No. 1).  Accordingly, the *Heck* standard, which applies only when a defendant seeks relief for a wrongful conviction or imprisonment, does not apply. *Heck*, 512 U.S. at 485.  Second, the *Rooker-Feldman* doctrine is similarly inapplicable; Ward does not seek review of the East Cleveland Municipal Court's decision in Ward's underlying traffic conviction.  *Rooker*, 263 U.S. at 416.

evidence to charge Foti with Interfering with Civil Rights (M1).  (ECF No. 31-8, PageID #699).

For purposes of Ward's § 1983 claims, the second element is met and the only question remaining

is whether Defendants' conduct violated Ward's rights under the Constitution or the laws of the

United States.

### C.    The Qualified Immunity Doctrine

Defendants argue in their motions that they are entitled to qualified immunity, relieving

them of Ward's claims.  (ECF No. 31, PageID #595; ECF No. 49, PageID #919–21).  The doctrine

of qualified immunity shields government officials from civil liability in the performance of their

duties so long "as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."  *Getz v. Swoap*, 833 F.3d 646, 652 (6th

Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is not

merely a defense to liability; the doctrine provides immunity from suit altogether.  *Jacobs v. Alam*,

915 F.3d 1028, 1039 (6th Cir. 2019).  This form of immunity "gives government officials breathing

room to make reasonable but mistaken judgments about open legal questions," and protects "all

but the plainly incompetent or those who knowingly violate the law."  *Ashcroft v. al-Kidd*, 563

U.S. 731, 743 (2011) (internal quotations omitted).

Courts engage in a two-step inquiry to determine whether a defendant is entitled to

qualified immunity. "First, viewing the facts in the light most favorable to the plaintiff, has the

plaintiff shown that a constitutional violation has occurred? Second, was the right clearly

established at the time of the violation?"  *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015)

(citing *Miller v. Sanilac Cnty.*, 606 F.3d 240, 247 (6th Cir. 2010)).

Since qualified immunity presumptively protects a public official conducting his official

duties, the plaintiff bears the burden of showing that it does not apply to the defendant's conduct.

13

*Id.* (citing *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)); *see Mays v. City of Dayton*, 134 F.3d 809, 813 (6th Cir. 1998) ("While acting in his role of law enforcement officer, [the officer defendant] presumptively receives immunity for acts committed in the course of his duties."). To do this, "the plaintiff must show a substantial correspondence between the conduct in question and prior law allegedly establishing the defendant's actions were clearly prohibited." *Hughes v. City of N. Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996).

### 1. Violation of a Constitutional Right

Ward claims Officers and Foti used unreasonable and excessive force during his arrest. (ECF No. 33, PageID #712; ECF No. 50, PageID #1054). Defendants maintain that Officers' and Foti's conduct was objectively reasonable. (ECF No. 31, PageID #513; ECF No. 49, PageID #921).

### a. The Fourth Amendment's Protection from Excessive Force

The Fourth Amendment guarantees the right of individuals to be free from excessive force during an arrest. *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). While the Supreme Court has long recognized that a police officer's right to make an arrest includes a companion right to use some force to effect it, officers' use of force must be objectively reasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 396 (quoting *Scott v. United States*, 436 U.S. 128, 137–39 (1978); *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). This inquiry accounts for the tense, uncertain, and rapidly evolving circumstances in which police officers are often forced to make split-second judgments about the appropriate amount of force to use. *Graham*, 490 U.S. at 396–97. To determine whether an officer's use of force was objectively reasonable, courts balance three factors: (1) "the severity of the crime at issue"; (2) "whether the

14

suspect posed an immediate threat to the safety of officers or others"; and (3) "whether the suspect is actively resistant or attempting to evade arrest by flight." *Id*. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). Courts evaluate reasonableness from the perspective of an objective officer. *Dunigan v. Noble*, 390 F.3d 489, 493 (6th Cir. 2004).

While the *Graham* factors are a helpful guide, the Sixth Circuit urges district courts to look at the totality of the circumstances of the incident to determine whether the officer's use of force was reasonable. *Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2022); *see Graham*, 490 U.S. at 395 (explaining that the reasonableness test "is not capable of precise definition or mechanical application"). The Sixth Circuit has also adopted a "segmented analysis" approach; the officer's actions must be reasonable right before she allegedly used excessive force. *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996); *Greathouse v. Couch*, 433 F. App'x 370, 372 (6th Cir. 2011); *see Pleasant v. Zamieski*, 895 F.2d 272, 276 (6th Cir. 1990) (segmenting whether it was reasonable for the officer to (1) draw his gun; and (2) not return his gun to his holster); *Claybrook v. Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001) (analyzing separately whether officers violated the knock-and-announce rule and whether officers used deadly force against the plaintiff). This segmented approach applies "even to encounters lasting very short periods of time." *Greathouse*, 433 F. App'x at 372.

Here, the **first segment** of the encounter includes all of the actions taken by the Officers and Foti until Ward fled from them the first time. (ECF No. 33, Ex. A, 0:00–0:20). The **second segment** includes everything between Ward's initial flight from Officers and Foti until Ward appears to have stopped resisting Officers' and Foti's efforts to arrest him. (*Id.* at 0:21–3:02). The **third segment** includes the force used against Ward after he appears to have stopped resisting Officers and Foti, but before Officers secured Ward's hands behind his back. (*Id.* at 3:02–3:17).

15

The **fourth segment** encompasses everything that occurred once Officers and Foti had secured Ward's hand behind him and beyond, including punching him, tasing him, and stomping on his head. (*Id.* at 3:13–5:35).

b. Application of the *Graham* Factors

i. First Segment

Due to the complexity of the series of events that make up Ward's arrest, the Court considers the *Graham* factors holistically in each segment of the encounter. As for the first segment, Ward argues that it was excessive for Officers and Foti to approach Ward with their guns drawn during the initial traffic stop before he fled. (ECF No. 33, PageID #733; ECF No. 50, PageID #1055).

A police officer may approach a suspect with a weapon drawn during a stop when the officer reasonably fears for his safety. *United States v. Hardnett*, 804 F.2d 353, 356–57 (6th Cir. 1986) (finding that where police presented "specific and articulable facts which created a reasonable suspicion of criminal activity," they acted reasonably in approaching the occupants of a vehicle with weapons raised). When a driver evades arrest or acts erratically, a reasonable police officer is likely to be concerned that someone in the car may have a weapon or that the car itself may be used as a weapon. *Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008) (finding that a reasonable police officer would reasonably believe a driver evading arrest or acting erratically posed a threat until he is "out of the car and handcuffed"). Even so, a claim of excessive force may be sustained when an unarmed civilian, even one who has control over a vehicle, objectively poses no threat to the officer or the public and the officer points a gun at that civilian. *Wright v. City of Euclid*, 962 F.3d 852, 866 (6th Cir. 2020) (citing *Croom v. Balkwill*, 645 F.3d 1240, 1252 n.17 (11th Cir. 2011)).

Courts finding that officers acted reasonably when approaching a suspect with weapons drawn do so only after finding that officers had a reason to view the suspect as a threat. For example, in *Hodge v. Blount Cty*., No. 3:16-CV-317, 2018 WL 1463390, at *3 (E.D. Tenn. Mar. 23, 2018), *aff'd*, 783 F. App'x 584 (6th Cir. 2019), the arrestee, Hodge, fled the scene of a hit and run. When an officer tried to pull him over, his truck lurched twice before coming to a stop. (*Id.*). The officer approached Hodge with his gun raised. *Id.* Although the Court questioned the need for the officer's drawn weapon to carry out the arrest, the court decided that the officer's bases for doing so were reasonable: the dispatcher had told the officer that Hodge had fled the scene of a hit-and-run at a "high rate of speed"; the officer questioned Hodge's state of mind, having just fled such a scene in such a way; dispatch told the victim to stay away from Hodge; and he was concerned that Hodge may attempt to evade arrest since he was already in flight. (*Id.*).

In another matter, *Giannola v. Peppler*, 142 F.3d 433 (Table), at *1 (6th Cir. 1998), police tried to stop an elderly Italian-speaking man, Giannola, who was driving 10 to 20 miles per hour below the posted speed limit, causing a roadway hazard. *Id.* When an officer activated his lights and sirens, Giannola refused to pull over. *Id.* The officer called for backup, and two more officers joined the low-speed pursuit, eventually pulling in front of Giannola's truck and forcing him to stop. *Id.* The officers approached Giannola's truck with their guns drawn; the Sixth Circuit ruled that this was an acceptable use of force because Giannola "appeared to be refusing a lawful order to pull over." *Id.* at *3.

Ward was driving under 30 miles per hour when Officers and Foti pulled him over for driving on the sidewalk. (ECF No. 31-1, PageID #607). The body camera footage of the incident suggests that Officers and Foti were behind Ward for about 12 to 14 seconds before Ward pulled over the first time (though the lights and sirens were already on when the body camera began

17

recording); they immediately drew their weapons and directed them at Ward.  (*Id.* at 0:00–0:20).

Neither Officers nor Foti explain why they chose to approach Ward with their weapons drawn.

(ECF No. 31, PageID #593).  Officers and Foti also do not point to anything in the record showing

they had probable cause to arrest Ward for anything more than a mere traffic infraction (driving on

the sidewalk).  (ECF No. 31-1, PageID #607); s*ee Goodrich v. Everett*, 193 F. App'x 551, 555 (6th

Cir. 2006) (determining the crime at issue by referencing the crime officers reasonably believed

had been committed by the suspect they were arresting).

Foti attests in the affidavit attached to his Motion for Summary Judgment that one officer—

who is not named as a defendant here—decided to draw his weapon because of "Plaintiff's failure

to stop after the activation of the lights and sirens."  (ECF No. 49, PageID #914).  Notwithstanding

that this is apparently hearsay testimony about which Foti does not have personal knowledge,[3] Foti

fails to justify his or Officers' own decisions to draw *their* weapons; Foti does not argue that he

was motivated by a threat to him or other Officers at that point of the encounter, nor do Officers

claim that they were concerned that Ward would flee.  Unlike the officers in *Giannola*, who only

drew their weapons after they forcibly stopped Giannola with another police car, Officers and Foti

drew their weapons after Ward stopped voluntarily following a minor traffic violation.

Neither East Cleveland Defendants nor Foti point to articulable facts in the record

supporting a reasonable suspicion that Ward was engaged in criminal activity or that they feared

for their safety during the initial stop.  Without more, the Court cannot find that Officers' and Foti's

decisions to approach Ward with their guns drawn during the initial stop were objectively

---

[3] Fed. R. Civ. P. 53(c)(4) provides that affidavits or declarations "used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated."  Foti offers no basis for his personal knowledge of Officer Welms's claim that Welms drew his gun because of "Plaintiff's failure to stop after activation of the lights and sirens."  (ECF No. 49-1, PageID #924).  This sworn statement does not qualify as valid evidence in opposition to Ward's motion nor in support of his own motion.

reasonable.  At best, there is a genuine issue of material fact as to the length of Ward's delay in pulling over during this segment of the encounter; if Ward delayed pulling over for longer than the body camera footage suggests, a reasonable juror could find that he was fleeing law enforcement, causing Officers and Foti to have reasonable concern for their safety.  *See Giannola v. Peppler*, 142 F.3d 433 (Table), at \*3 (6th Cir. 1998) (holding lengthy flight from officers and failure to stop voluntarily justified officers' decision to approach suspect with weapons drawn).

### ii.  Second Segment

The second segment of the stop includes Officers' and Foti's decisions to break Ward's window and pull him out of his car, eventually forcing him to the ground.  Ward argues that these acts were excessive as a matter of law.  (ECF No. 33, PageID #713; ECF No. 50, PageID #1055).

During a lawful traffic stop, police officers act reasonably when they order a vehicle's occupant to exit.  *Maryland v. Wilson*, 519 U.S. 408, 414–15 (1997); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977).  Officers may use force against a driver who refuses to get out of his car when lawfully ordered to do so.  *Dixon v. Roscommon Cnty.*, No. 09-14236-BC, 2011 WL 281042, at \*6 (E.D. Mich. Jan. 25, 2011) (holding that blows to the head and forcible removal of a plaintiff from his car were objectively reasonable when the plaintiff was under the influence of narcotics, acted erratically, and refused to exit the vehicle).  The kind of force permissible in such a situation is limited; officers cannot use "gratuitous violence" to remove a driver from her car.  *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (2006) (citing *Phelps v. Coy*, 286 F.3d 295, 302 (2002)).  That said, active resistance, like physical force, failure to comply with police orders, and flight from a police officer, can warrant an increase in police officers' use of force.  *See Jackson v. Washtenaw Cnty.*, 678 F. App'x 302, 306–09 (6th Cir. 2017) (holding that flight from police

19

officers, disobeying their commands, and physically resisting their efforts to make an arrest warranted tasing and punching the suspect).

Officers and Foti used reasonable force during this segment of the encounter.  First, regarding breaking Ward's car window and deploying stop sticks, the Court observes that some use of force is objectively reasonable to apprehend a fleeing suspect, particularly during a car chase.  *Hurd v. Adams*, No. 7:20-CV-00047, 2023 WL 4306667, at *10 (E.D. Ky. June 30, 2023) (finding that the deployment of spike strips, the breaking of a car's window, initial blows to the head, and forcible removal from a vehicle were objectively reasonable actions in the context of a high-speed car chase).  While Ward did not engage in a high-speed car chase (the parties agree that Ward never exceeded 30 miles per hour), he fled from Officers and Foti twice and did not stop when ordered by Officers and Foti to do so.  (ECF No. 33, Ex. A, 0:20–2:27).  This conduct supports Officers' and Foti's probable cause to believe Ward fled and disobeyed lawful orders (the crimes with which he was originally charged), and thus supports an increase in the force they used. (*See* ECF No. 31-2, PageID #612).  A reasonable officer in these circumstances would have some justifiable fear for his safety; Officers' and Foti's decisions to break Ward's window and deploy stop sticks were objectively reasonable.

Next, concerning Officers and Foti's efforts to extract Ward from his car, Ward remained inside his locked vehicle despite Officers' and Foti's commands to "get out of the car".  (ECF No. 33, Ex. A, 1:51–55; 2:26–2:49).  Officers had to break Ward's driver's side window and wrestle him from his seat to get him out.  (*Id.* at 1:57–2:00; 2:26–2:49).  He was pulled to the ground.  (*Id.* at 2:58–3:01).  These acts are not the type of "gratuitous violence" that violate the Fourth Amendment in such a setting.  *See, e.g.*, *Dunn v. Matatall*, 549 F.3d 348, 355 (6th Cir. 2008) (deciding that officers did not use excessive force when they pulled the suspect from his car and

20

broke his leg after the suspect led officers on a high-speed chase and refused lawful commands to exit); *Williams v. Ingram*, 373 F. App'x 542, 547 (6th Cir. 2010) (holding that officers did not use excessive force when they struck a suspect who refused to get out of his car with an asp in his torso and thigh, then pulled the suspect from his car by his arms following a high-speed car chase). Officers and Foti acted reasonably and are therefore entitled to qualified immunity with respect to this segment of the encounter.

iii.   Third Segment

The third segment of the encounter includes the force used against Ward after he appeared to stop resisting Officers' and Foti's efforts to arrest him. In *Michaels v. City of Vermillion*, 539 F. Supp. 2d 975, 985–86 (N.D. Ohio 2008), this Court observed that "a line of Sixth Circuit cases holds that the use of non-lethal, temporary incapacitating force on a handcuffed suspect who no longer poses a safety threat, flight risk, and/or is not resisting arrest constitutes excessive force." *Id.* (citing *Bultema v. Benzie Cnty.*, 146 F. App'x 28, 35 (6th Cir. 2005) ("It is well established in this circuit that the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional."); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (holding that it was unconstitutional for arresting officers to use pepper spray on a prone arrestee who had stopped resisting arrest and posed no flight risk); *Vaughn v. City of Lebanon*, 18 F. App'x 252, 265 (6th Cir. 2001) (finding a genuine issue of material fact on the issue of excessive force when the arrestee did not resist arrest, officers sprayed him at least once with pepper spray, and the parties' accounts of the encounter differed significantly); *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994) (explaining that, if the arrestee's version of the facts were proven at trial and a jury found the arrestee did not resist an officer's lawful orders, the officer's use of mace against the arrestee would constitute excessive force).

21

The body camera footage at issue *appears* to show that Ward stopped resisting during this segment, though the at-times chaotic footage does not show Ward's entire body to conclusively find that he was not resisting Officers' and Foti's efforts to subdue him.  (*Id.*).  If Ward *had* stopped resisting, the body camera footage suggests that Officers and Foti could have placed him in handcuffs and walked him to one of the several police cars on the scene.  Officer Foti testified that he and Officers did not handcuff Ward at this time because they couldn't; Ward's "arms were underneath his stomach against the ground."  (ECF No. 52-2, PageID #1202).  This testimony is belied by the body camera footage, which shows both of Ward's hands (held down by Officers by his wrists) on the ground above his head before Officer's and Foti's punches and kicks.  (ECF No. 33, Ex. A, 3:01–02).

Though Officers and Foti did not handcuff Ward at this point, his lack of handcuffs does not preclude this Court from finding a genuine issue of material fact as to whether the force used by Officers' and Foti's was excessive and thus violative of the Fourth Amendment.  Ward's initial resistance does not preclude his claim of subsequent excessive force against Officers and Foti.  *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607–08 (6th Cir. 2006) (citing *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006)).  It is not objectively reasonable for an officer to kick and punch someone "in the absence of resistance" when he is "essentially compliant."  *Id.* (citing *Tapp. v. Banks*, 1 F. App'x 344, 350 (6th Cir. 2001)).  A jury could therefore find that Officers and Foti acted unreasonably when they kicked and punched Ward after he stopped resisting, and while three Officers held Ward down by his wrists, head, and legs.

iv.   Fourth Segment

The fourth, and perhaps most serious, segment of the encounter includes the force used by Officers and Foti after they gathered Ward's hands behind his back and continued to hold him

22

down.  The Sixth Circuit has routinely held that once an arrestee is secured, he no longer poses a risk to arresting officers, meaning that subsequent force is excessive as a matter of law.  *See, e.g.*, *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994) (holding use of force after incapacitation by mace would be excessive as a matter of law); *Phelps v. Coy*, 286 F.3d 295, 301–02 (6th Cir. 2002) (holding use of force was excessive when officer had handcuffed the plaintiff and was sitting on top of him); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 2002) (holding that hitting a handcuffed arrestee with a nightstick would be excessive); *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607 (6th Cir. 2006) (holding that striking an arrestee's knee after he had surrendered was gratuitous); *Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 539 (6th Cir. 2015) (holding shoving handcuffed detainee to a cement floor, holding him in a chokehold to the point of unconsciousness, and leaving him to die was excessive).  As already discussed, handcuffs themselves are not a necessary predicate to a finding of excessive force when the arrestee has been subdued and is no longer resisting.  *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607–08 (6th Cir. 2006).

To reiterate the force used during the fourth segment of the encounter, after Officers and Foti pulled Ward's hands behind his back, Officer Berry held Ward's head face-down against the pavement and pressed his knee into Ward's back; Ward was fully incapacitated and showed no signs of resistance.  (ECF No. 33, Ex. A, 3:11–3:13).  Officer Foti testified that he was not afraid of Ward at this point because he was on the ground surrounded by four officers.  (ECF No. 52-2, PageID #1205).  Despite his being fully secured, Officers and Foti tased Ward again.  (*Id.* at 3:12–3:15).  Foti stomped on Ward's head twice.  (*Id.* at 3:18–3:20).  Officers and Foti tased Ward for a third time.  (*Id.* at 3:24–3:28).  When Ward screamed, "Stop!  Stop!  Stop!", Officer Berry responded by punching Ward in the back and neck area twice.  (*Id.* at 3:29 –3:33; *see supra* at 6).

East Cleveland Defendants rely on *Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021) (per curiam) to support Officer's argument for qualified immunity, but that case involved a vastly different scenario than this one.  In *Rivas-Villegas*, officers responded to a 911 call from a 12-year-old girl who told the dispatcher that she, her mother, and her sister had shut themselves into a room in their home because her mother's boyfriend was armed with a chainsaw and trying to hurt them. *Id.* at 3.  When the boyfriend eventually came out of the house without a weapon in his hands, officers noticed a knife in his pocket and ordered him to keep his hands up. *Id.* at *4.  The boyfriend lowered his hands, and one of the officers shot him twice with beanbag rounds from his shotgun. *Id.*  After the second shot, officers commanded the boyfriend to the ground, and he complied; one officer placed his knee on the boyfriend's back for about eight seconds while pulling the boyfriend's hands behind his back.  Another officer approached, removed the knife from the boyfriends pocked, and handcuffed him. *Id.*

The Supreme Court reversed the Ninth Circuit's determination that the officer's knee on the boyfriend's back was excessive. *Id.* at *5, *7.  The Court noted that officers were responding to a domestic violence call involving a chainsaw, in which the perpetrator was also armed with a knife. *Id.* at *7.  There was no claim that the officer's knee was pressed particularly hard into the boyfriend's back, and the parties stipulated that the officer only used such force for about eight seconds. *Id.* The Court therefore decided that the officer's use of force was reasonable, and that he was entitled to qualified immunity. *Id.* at *8.

The contrast between these two cases is instructive.  The Court is not merely grappling with whether Officers and Foti are entitled to qualified immunity because of Officer Berry's knee against Ward's back.  The parties do not dispute that Ward was unarmed, and neither Officers nor Foti have articulated any safety concerns they had at this point in the encounter.  Yet, unlike the

24

officers in *Rivas-Villas*, Officers and Foti did not stop using force against Ward after they incapacitated him; with his hands held behind his back and at least three Officers on top of him, Officer Foti stomped on Ward's head and Officer Berry punched Ward's back and neck.  Indeed, *Rivas-Villegas* is inapposite at best.

In his defense, Foti argues that "severity of the crime at issue was largely unknown" such that it was hard to determine the appropriate amount of force to use.  (ECF No. 49, PageID #921).  Foti also claims that he meant to strike Ward's suprascapular area only once to gain control of Ward and enable Officers to secure Ward's hands, and that the second strike was due to Foti losing balance after another officer bumped him.  (ECF No. 49, PageID #915).  The video of the encounter again contradicts Foti's narrative.  The video shows first that Ward's hands were secured behind his back and that Foti's legs were clear of obstructions before Foti deliberately stomped on his head twice.  (ECF No. 33, Ex. A, 3:08–3:25).  Foti's admission that Ward no longer posed a threat, together with his guilty plea in connection with assaulting Ward, likewise contradict Foti's current version of these events.  (ECF No. 52-2, PageID #1205; ECF No. 50-4, PageID #1112).

Viewing the events in the light depicted in the video, the force used against Ward during the fourth segment of the encounter was obviously excessive and defied more than thirty years of controlling precedent.  *See Cunningham v. Shelby Cnty., Tenn.*, 994 F.3d 761, 763 (6th Cir. 2021) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (explaining that, when video evidence is available, the court views the facts in the light of the video)).  No reasonable juror could find that the force exerted against Ward after he was fully incapacitated was reasonable or necessary to carry out a lawful arrest.  Because these acts of force occurred after Ward was secured, there is no genuine issue of material fact that they were all excessive as a matter of law.

### 2.  *Clearly Established Right*

To determine whether a constitutional right was clearly established at the time of the incident, courts cannot define that right "at a high level of generality."  *Mullenix v. Lunai*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 742 (2011)).  Rather, the right must relate to the particular conduct at issue in the case.  *Id.* (quoting *Ashcroft*, 563 U.S. at 742).  This is particularly important when addressing Fourth Amendment violations, since "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)).  In other words, for the district court to deny qualified immunity to a public official, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Mullenix*, 577 U.S. at 12 (2015) (citing *Ashcroft*, 563 U.S. at 731).

A right is clearly established when a reasonable officer would clearly recognize that his conduct is unlawful under such circumstances.  *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 900 (6th Cir. 2014) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).  The unlawfulness of an officer's conduct "must be apparent in light of pre-existing law," but the particular conduct at issue need not be the subject of direct holdings alone.  *Id.* (citing *Anderson*, 483 U.S. at 604).  Courts can also look to "specific examples described as prohibited" or "the general reasoning that a court employs."  *Id.* (citing *Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012)).

The constitutional rights Ward alleges Officers and Foti violated (and which this Court has not already awarded qualified immunity) were clearly established on the date of Ward's arrest. First, concerning approaching Ward with guns drawn, the Sixth Circuit holds that approaching an

26

unarmed, nonthreatening civilian with weapons drawn, even where the suspect is in control of a vehicle and has committed a traffic violation, violates clearly established law.  *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 868 (6th Cir. 2020); *see also Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (recognizing that pointing a gun at an individual can constitute excessive force under the Fourth Amendment).  Moreover, subsequent Sixth Circuit jurisprudence, predating this case, establishes that officers must provide at least some support indicating a suspect posed a threat to justify their decision to draw weapons during the first stage of an encounter.  *Hodge v. Blount Cnty., Tenn.*, No. 3:16-cv-317, 2018 WL 1463390, at *3 (E.D. Tenn. Mar. 23, 2018).  The Court cannot assume Ward posed a safety risk to Officers and Foti.  *Wright*, 962 F.3d at 869.

In *Wright*, two officers pulled over an African American man, Wright, for failing to use his turn signal.  962 F.3d at 860–61.  Wright had visited a home that police suspected was the site of illicit drug activity; Wright never left his car during the one-minute-long visit, staying in the home's driveway and speaking to someone on a nearby porch, before leaving.  *Id*. The officers subsequently approached Wright's vehicle with their weapons drawn.  *Id*.  The Court held that the officers violated a clearly established constitutional right because they pointed their guns at Wright when he was (1) unarmed, (2) not fleeing, and (3) not posing a safety risk to the officers.  *Id*. at 870 (citing *Saad v. City of Dearborn*, No. 10-12635, 2011 WL 3112517, at *5 (E.D. Mich. July 26, 2011), *aff'd sub nom. Saad v. Krause*, 472 F. App'x 403 (6th Cir. 2012) (per curiam) (noting that the Sixth Circuit has "held that pointing a gun at an unarmed suspect who is not fleeing or posing a risk to police officers may be an objectively unreasonable use of force).

Like *Wright*, Ward committed a minor traffic infraction and was not apparently involved in any other criminal activity.  962 F.3d at 866.  Still, Officers and Foti drew their weapons and pointed them at Ward the first time they pulled him over before even reaching his driver's side

window; neither Officers nor Foti argue that they did so out of a fear for their safety.  (ECF No. 32, PageID #593).  Driving over the sidewalk, like failing to use a turn signal, cannot explain why Officers and Foti needed three police vehicles and multiple drawn weapons to mitigate any threat Ward posed.  In *Wright*, the plaintiff also moved his vehicle in response to the officers' initial approach, but the Court did not consider this subsequent flight dispositive of whether the decision to draw weapons was excessive.  962 F.3d at 870.  Here, too, Ward's flight from Officers and Foti when they were already pointing their guns at Ward is irrelevant to Officers' and Foti's decision to draw their guns in the first place.  Should a jury find that he was not fleeing law enforcement before he stopped the first time, Ward's right not to have weapons pointed at him when he posed no discernible threat to Officers and Foti was clearly established on the date of his arrest.

Second, concerning the force used against Ward after he stopped resisting, the Sixth Circuit has long held that force used against a suspect who is no longer resisting efforts to bring about his arrest is unconstitutional.  *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607–08 (6th Cir. 2006) (holding right to not be beaten with an asp following surrender was clearly established); *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 687–88 (6th Cir. 2006) (explaining that the unconstitutionality of using gratuitous force against a helpless and incapacitated subject during arrest has been clearly established since 1991) (citing *Phelps v. Coy*, 286 F.3d 295, 302 (6th Cir. 2002); *Tapp v. Banks*, 1 F. App'x 344, 350 (6th Cir. 2001) (holding "both the right to be free from unreasonable seizures and to be free from the use of excessive force under the Fourth Amendment are clearly established" when officer beat suspect's knee with a baton after he surrendered).  The Court holds the same here; if a jury finds that Ward had stopped resisting during this part of the encounter, his right not to be beaten after he stopped resisting was clearly established on the date of his arrest.

28

Third, concerning Officers and Foti's acts of force against Ward after he was secured, Sixth Circuit jurisprudence has held for at least three decades that using force against a civilian after he is fully secured is excessive as a matter of law.  For instance, in *Hammock v. Rogers*, No. 1:17-CV-1929, 2019 WL 7944420, at *12 (N.D. Ohio Nov. 13, 2019), this Court reasoned that no officer could believe that beating a restrained suspect or striking him in the face after he was secured was objectively reasonable.  *Id.* (citing *Phelps*, 286 F.3d at 301–02, *Baker*, 471 F.3d at 607); *see, e.g.*, *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994) (holding use of force on a suspect after he had been incapacitated by mace is excessive force as a matter of law).  Here, after Ward was secured, Officers and Foti beat and tased him, and most excessively, Foti stomped on his head twice.  (ECF No. 33, Ex. A, 3:18–3:33).  The Court finds that no officer could believe these actions were objectively reasonable given that Ward's right to be free from such conduct was clearly established.

### D.  Failure to Intervene

Count IV alleges that Officers and Foti failed to intervene in violation of Ward's rights. East Cleveland Defendants do not directly address this claim in their Motion, arguing only that the Officers' actions were objectively reasonable.  (ECF No. 31, PageID #593).  They also do not respond to Ward's arguments on this Count in his Motion for Summary Judgment.  (ECF No. 51). Foti, however, argues in his Motion for Summary Judgment that Ward has failed to show that he can meet either element of the failure to intervene test.  (ECF No. 49, PageID #922).

A bystanding officer can be liable under § 1983 for failure to intervene when: 1) the officer observed or had reason to know that excessive force was being used, and 2) the officer could have prevented the harm from occurring.  *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).  The second element requires a plaintiff to show that the use of force against him lasted "long enough" for observing officers to "both perceive what was going on and intercede to stop it."  *Pelton v. Perdue*,

731 F. App'x 418, 426 (6th Cir. 2018) (quoting *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013 (citing *Durham v. Nu'Man*, 97 F.3d 862, 868 (6th Cir. 1996))).  In *Goodwin v. City of Painesville*, 781 F.3d 314, 328–29 (6th Cir. 2015), the Sixth Circuit held that reasonable jurors could find officers failed to intervene when one of them tased the arrestee twice while the others were trying to handcuff the arrestee.

Ward points to *Briggs v. Miles*, No. 15-1386, 2017 WL 2174252 (6th Cir. 2017) in support of this portion of his Motion for Summary Judgment.  In *Briggs*, three officers watched from outside a prison transport van while two other officers choked a prisoner and twisted his neck for several minutes.  *Id.* at *2.  The Sixth Circuit held that a reasonable jury could find that the three officers both (1) observed the two officers in the van restraining and choking the prisoner, and (2) "had the opportunity and means to stop this use of force."  *Id.* at *3.

The Court has already determined that a reasonable officer would have known that constitutional rights at issue in the fourth segment of the encounter were clearly established.  (*See supra* at 26–29).  The Court has also determined that Officers' and Foti's uses of force during this segment was excessive as a matter of law.  (*See supra* at 25).  Given that Officers and Foti were present throughout Ward's arrest, and given the Court's holding that they were violating Ward's clearly established rights to be free from excessive force, the first prong of the failure-to-intervene test is met.

The second prong of the failure-to-intervene test is more complicated. Officers and Foti not only failed to intervene to stop each other's violation of constitutional rights, but each also committed his own violations.  Officer Warner-Sims claims that he intervened during the encounter in part; in fact, the video shows that while holding Ward down, Officer Warner-Sims nudged Foti's leg away from Ward's head (presumably to prevent Foti from stomping Ward's head again).  (ECF

No. 33, Ex. A, 3:15–3:20; ECF No. 31-1, PageID #611).  Even so, Officer Warner-Sims held Ward down and participated in other acts that this Court has found excessive as a matter of law, and took no action to stop Officer Berry from punching, and Foti from twice tasing, Ward.

As the video of the encounter shows, Officers and Foti could have prevented the harm occurring at the hands of the other officers.  (*Id.*).  That harm—punching, tasing, and stomping—took place over the course of about 16 seconds.  (ECF No. 33, Ex. A, 3:17-3:33).  Within those 16 seconds, Officer Warner-Sims could prevent Foti from further stomping on Ward's head. Neither Officers nor Foti offer any basis for why 16 seconds was too short for them to stop the others' unconstitutional uses of force against Ward.  The Court therefore holds that Ward has met his burden of showing that there are no genuine issues of material fact related to his failure to intervene claim and that he is entitled to judgment on Count IV as a matter of law.

### E.    *Monell* or 'Municipality' Liability of the City and Chief Gardner

In Counts V and VI, the issue is whether the City and Chief Gardner are liable under 42 U.S.C. §§ 1983 and 1988 for implementation of an unconstitutional custom of excessive force and failing to train its officers—also known as *Monell* liability.  To be liable under *Monell*, Ward's constitutional violation must have occurred because of a "government's policy or custom."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  To establish such a policy or custom, Ward could show any of the following: (1) the existence of an illegal policy; (2) an official with final decision-making authority ratified illegal actions; (3) a policy of improper training or supervision; or (4) a

custom of tolerance or acquiescence of federal rights violations.  *Id*.  Here, the third and fourth

methods of establishing *Monell* liability are relevant.[4]

### 1. *Ratification of a Custom, Tolerance, or Acquiescence of Federal Rights Violations*

Count V of the Complaint alleges that the City, through its police department, "maintained

and implemented a policy, practice and/or custom, supported and ratified by its supervisory

officials, including Chief Gardner, of allowing its police officers to use excessive force in violation

of the Fourth Amendment."  (ECF No. 1, PageID #16).  To establish a custom of tolerance, a

plaintiff must show (1) a clear and persistent pattern of illegal activity; (2) the municipality's notice

or constructive notice of such pattern; (3) the municipality's tacit approval of (and thus deliberate

indifference to) the activity, amounting to an official policy of inaction; and (4) that the custom

was the "moving force" behind the plaintiff's constitutional deprivation.  *Alsaada v. City of

Columbus*, 536 F. Supp. 3d 216, 272 (S.D. Ohio 2021) (quoting *Stanfield v. Lima*, 727 F. App'x

841, 851 (6th Cir. 2018)).

That custom must "be so permanent and well settled" that it carries with it the force of law.

*Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S at 691).

In other words, the "custom" must "reflect a course of action deliberately chosen from among

---

[4] East Cleveland Defendants assert in their Motion for Summary Judgment that Ward "has not engaged in any discovery" related to Counts V and VI and that he has therefore forfeited those claims.  (ECF No. 31, PageID #585).  This argument fails for two reasons.  First, a plaintiff does not automatically forfeit a claim if she chooses not to pursue discovery on that claim.  *See Lear Auto Dearborn, Inc. v. Johnson Controls, Inc.*, 528 F. Supp. 654, 670 (E.D. Mich. Nov. 2, 2007) (finding that there is no support "for the proposition that a court's jurisdiction over a claim may be lost through a party's mere failure to actively pursue it during discovery, or even a party's express disavowal of the claim during discovery").  Procedural steps are required to formally abandon a claim, for example, by failing to address the claim in a response to a motion for summary judgment.  *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013).  Ward maintains his claims for *Monell* liability in his response to East Cleveland Defendants' Motion for Summary Judgment (ECF No. 33, PageID #715), and in his own Motion for Summary Judgment (ECF No. 50, Page #1059–62).  Second, the record proves Ward has made efforts to engage in discovery on his *Monell* claims.  (*See, e.g.*, ECF No. 33-3, Zoom Depo. of Scott Gardner, PageID #723; ECF No. 33-4, Zoom Depo. of Todd Carroscia, PageID #739).  Ward's inability to produce certain reports is also tied to East Cleveland Defendants' claims that certain records are either inaccessible or no longer exist.  (ECF No. 46, Am. Objection to Order to Compel Discovery, PageID #865).  This type of circular reasoning does not move the needle on Ward's *Monell* claims.

various alternatives," carried out in the same traditional ways as other state policies.  *Id.* (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)); *see Nashville, Chattangooga & St. Louis Ry. Co. v. Browning*, 310 U.S. 362, 369 (1940) (upholding a forty-year state "custom" of treating railroads differently than other property owners for tax purposes, despite lack of a formal "law" permitting as much).

In opposition to Ward's Motion, East Cleveland Defendants mention Foti's termination and rehiring, and make the conclusory allegation that Ward's evidence "has not reached the deliberate indifference standard" necessary to prove such a claim.  (*Id.* at PageID #1276).  In response, Ward first attached the lengthy East Cleveland Use-of-Force Policy ("Policy") to his opposition.  (33-3, PageID #728–36).  The first two sections of the Policy state:

> 102.001  Policy – It is the policy of the East Cleveland Police Department that officers use only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the officer and others.  It must be stressed that the use of force is not left to the unfettered discretion of the involved officer.  This is not a subjective determination.  The use of force must be objectively reasonable.  The officer must only use that force which a reasonably prudent officer would use under the same or similar circumstances.  In accordance with U.S. and Ohio Supreme [C]ourt decisions, specifically Tennessee v. Garner and Graham v. Conner.  It is understood that Officers of the East Cleveland Police Department may encounter resistance or aggression while engaged in the execution of their lawful duties.  Officers may only use the force which is objectively reasonable to affect lawful objectives including: affecting a lawful arrest or overcoming resistance to a lawful arrest, prevent the escape of an offender, or protecting or defending others or themselves from physical harm.
>
> 102.002  The degree of force used shall be based on the Reasonable Officer Standard.  The Reasonable Officer Standard will be used as a training tool in the training and instruction of officers in the use of force and the elements used in considering the level of force.

(*Id.*) (clarification added).  Ward then points to deposition testimony from Commander Carroscia, a patrol division commander (ECF No. 50-3, PageID #1077), in which Commander Carroscia stated that appropriate force is based on an officer's subjective "feeling":

> Q.     On behalf of the City of East Cleveland, are you able to give a yes or no answer to whether that was excessive force?
>
> A.     No, because I don't know exactly how the officers ***felt*** in regards to that man's actions.
>       A person's hands have to be close together until he's under control, and this is exactly what I told the grand jury.  Until your hands are that close together in there – I don't know what the officers are ***feeling*** until they know the man is secured.

(ECF No. 33-4, PageID #743) (emphasis added).  Officer Foti also testified that the force he used throughout his encounter with Ward—including stomping on Ward's head—derived from his training at the East Cleveland Police Department.  (ECF No. 50-4, PageID #1109–10).

The mere existence of an apparently constitutional policy does not resolve Ward's *Monell* claim.  The unwritten "custom" outlined from Commander Corroscia's testimony appears to abrogate the written Policy.  East Cleveland Defendants produced no evidence showing the Policy is implemented in accordance with its terms; in fact, the deposition testimony cited above suggests that it is not.[5]  At worst, Foti's and Commander Corroscia's testimony suggests that the Policy is not used at all and is therefore irrelevant to the Court's analysis.  At best, there are clear discrepancies between the Policy and its application.

In support of his Motion for Summary Judgment, Ward asks this Court to take judicial notice of "the large number of judgments against the Police Department and its officers due to

---

[5] East Cleveland Defendants argue that Ward has not shown a "custom" under *Monell* because Ward has identified no incidents other than his own in which East Cleveland Defendants kicked a suspect in the head.  (*Id.* at PageID #1275). This argument is briefly repeated in East Cleveland Defendants' own Motion.  (ECF No. 31, PageID #598–99).  For *Monell* purposes, the alleged "custom" need not be so specific.  *See, e.g.*, *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 412 (1997) (identifying, in dicta, the use of excessive force as the subject of a potential custom).  Consistent with this requirement, Ward claims that the custom relates to East Cleveland police officers' consistent use of excessive force.  (ECF No. 33, PageID #717).

excessive force" to support his claim of a "custom" resulting in consistent use of excessive force by the City's police officers.  (ECF No. 50, PageID #1061; ECF No. 50-6, PageID #1152–63). Most of the records of misconduct do not provide any information detailing the misconduct at issue.  Officer Katlyn Cooperwood and Chief Gardner received notices of termination due to their violations of departmental codes of conduct, but the letters do not state the conduct giving rise to those violations.  (ECF No. 50-6, PageID #1152; 1157).  Officer Tre Dehart-Robinson's notice of termination includes the result of his guilty plea in a case charging him with Dereliction of Duty under Ohio Rev. Code Ann. § 2921.44(B) (West 2024), but neither document outlines the conduct underlying that charge.  (*Id.* at PageID #1159–61).  The other two instances of misconduct—those relating to Chief Brian Gerhard and Officer William Mitchell—are unrelated to the type of conduct at issue.  (*Id.* at PageID #1154; 1163).  Even if the Court were to take judicial notice of this compilation of letters, reports, and court documents, they do little to establish a custom of consistent excessive force under *Monell*.  While these allegations may have been enough to escape dismissal under Fed. R. Civ. P. 12(b)(6), they are not enough to conclusively establish a lack of a genuine issue of material fact for trial under Rule 56.  *See Osberry v. Slusher*, 750 F. App'x 385, 397–98 (6th Cir. 2018) (denying motion to dismiss when the court was uncertain as to the facts or circumstances of each of six cases over six years of apparent officer misconduct because, if true, they could show a pattern of misconduct).

The undated "Press Release" from the City concerning officer arrests, including arrests by Officers Warner-Sims and Foti, also leaves out details of the conduct resulting in those arrests.  (*Id.* at PageID #1153).  Through its expression of thanks to Cuyahoga County Prosecutor Michael O'Malley and other law enforcement agencies, the Press Release at least *appears* to relate to the news report cited in Ward's opposition to East Cleveland Defendants' Motion.  (ECF No 33,

PageID #716).  According to the report, Cuyahoga County Prosecutor Micheal O'Malley indicted 11 East Cleveland police officers (including Foti) relating to "31 separate incidents between June 2018 and July 2022."  Bill Hutchinson, *Third of Officers in an Ohio Police Department Hit with Civil Rights and Abuse Charges*, ABC News (Mar. 9, 2023), [https://perma.cc/N4LC-XXXV].  The article claims that these officers were indicted relating to "abuse perpetrated on community residents . . . akin to 'torture.'"  *Id.*  Body camera footage imbedded in the article shows "the officers allegedly beating, kicking and stomping community residents, including several who were brutalized after being handcuffed and appearing to comply with officers['] order to get on their knees."  *Id.* (clarification added).

If the Press Release is indeed related to the news article, the two together establish the custom of tolerance alleged by Ward.  The 11 officers allegedly engaged in excessive force and the Press Release shows the City's knowledge of that force; combined with Commander Carroscia's testimony, there appears to be a deliberate indifference as to the force used by officers so long as the officer subjectively thought it was appropriate.  If true, these circumstances would arguably have combined to create the constitutional violations Officers and Foti perpetrated against Ward. The problem for Ward, however, is that there is not enough in the record to *verify* that any of this is, in fact, true. The Court has to draw all inferences in favor of the City and Chief Gardner where Ward's Motion is concerned.  Absent verification, genuine issues of material fact remain regarding the content of the officer misconduct records, the matter(s) referred to in the Press Release, and substantiated details of the 11 officers' alleged conduct amounting to excessive force.

### 2.  Policy of Improper Training or Supervision

Count VI of the Complaint is based on the City's and Chief Gardner's failure to adequately train officers regarding "job duties as they relate to Fourth Amendment violations."  (*Id.* at PageID

#17).   Under this method for showing *Monell* liability, Ward must prove that the City and Chief
Gardner ignored a "clear and persistent pattern of misconduct," that would prompt a need for
corrective training due to some prior deficiency in training.  *Osberry v. Slusher*, 750 F. App'x 385,
397 (6th Cir. 2018).   Courts are urged to acknowledge that "in virtually every instance where a
person has had his or her constitutional rights violated by a [municipality's] employee, a Section
1983 plaintiff will be able to point to something the [municipality] could have done to prevent the
unfortunate incident."  *City of Canton v. Harris*, 489 U.S. 378, 392 (1989).  Thus, improper training
claims must be supported by a municipality's pattern of factually similar conduct.  *Connick v.
Thompson*, 563 U.S. 51, 62–63 (2011).   "A government body's 'fail[ure] to act in response to
repeated complaints or constitutional violations by its officers' constitutes a deliberate indifference
for an inadequate training claim," which supports a finding of *Monell* liability.  *Jackson v. City of
Cleveland*, 586 F. Supp. 3d 737, 752 (N.D. Ohio 2022) (quoting *Brown v. Shaner*, 172 F.3d 927,
931 (6th Cir. 1999)). All the same, "culpability for a deprivation of rights is at its most tenuous
where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

East Cleveland Defendants' Motion claims that Ward did not raise any training issues.
(ECF No. 31, PageID #599).  This is untrue.  As already stated, Count VI of the Complaint concerns
the City's and Chief Gardner's failures to train their police officers.  (ECF No. 1, PageID #16–17).
As the moving party on summary judgment, East Cleveland Defendants needed to affirmatively
show that Officers and Foti were properly trained and supervised, and they have not met that
burden.

Ward's Motion again relies heavily on Commander Carroscia's deposition testimony.  (ECF
No. 50, PageID #1060–62).  The use-of-force Policy states that officers are required to train at
least annually in the use of less-lethal tactics, like the use of police batons or the deployment of

37

tasers.  (ECF No. 33-3, PageID #729).  According to the Policy, that training must be documented along with "approved lesson plans, attendance records, and scores on individual written and practical demonstrations of proficiency."  (*Id.*)  Commander Carroscia knew very little about the department's efforts to train officers regarding use of force under that Policy.  (ECF No. 50-3, PageID #1077).  For example, Commander Carroscia could not give any specifics on the types of use-of-force training the department provides to officers; aside from providing each new officer with a copy of the Policy, he could only recall that "blocks of education" had occurred in the past and that one of those blocks concerned "defensive tactics training."  (*Id.* at PageID #1075). Commander Carroscia also stated, after reviewing the body camera footage before this court, that Ward's arrest was "pretty much textbook."  (*Id.* at PageID #1076).  He could not testify as to Officer Foti's history of use-of-force training, and acknowledged a need for more use-of-force training within the department.  (*Id.* at PageID #1075).  Commander Carroscia testified that, to his knowledge, there had been no recent mandatory training sessions involving officer role-play simulations.  (*Id.* at PageID #1082).

In response, East Cleveland Defendants do not argue that Officers' or Foti's training, or their supervision, was sufficient.  (ECF No. 34, PageID #769).  Instead, they point to *Stewart v. City of Euclid*, 970 F.3d 667 (6th Cir. 2020) to support their claim that there is no causal link between any training failure and the violations of Ward's constitutional rights.  Like other cases cited by East Cleveland Defendants, that case has little application to this one.

In *Stewart*, the officer had been trying to get a driver out of his car from the passenger side when the driver sped away with the officer still inside his car.  *Id.* at 670.  Non-lethal uses of force, including punches to the driver's head and deploying a taser, proved ineffective to incapacitate the driver.  *Id.* at 670–71.  The driver's movements were erratic and dangerous, slamming the officer

38

into various parts of the car; the officer tried but ultimately failed to gain control of the car. *Id.* at 671. The officer then fatally shot the driver. (*Id.*). Relevant here, the Sixth Circuit's qualified immunity analysis determined that there was no clearly established law demonstrating the unconstitutionality of the officer's use of force in those circumstances. *Id.* at 675. When addressing a failure-to-train claim, the Court first explained that "[t]he violated right in a deliberate indifference case . . . must be clearly established because a municipality cannot *deliberately* shirk a constitutional duty unless that duty is clear." *Id.* at 676 (quoting *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 998, 994–95 (6th Cir. 2017)) (emphasis in original). With that understanding, the *Stewart* Court held: "Here, Stewart's rights were not clearly established in the precedent of this circuit or otherwise. Thus, violation of his rights cannot be the "known or obvious consequence" disregarded by the City of Euclid through its training program and the *Monell* claim fails." *Id.* at 676.

Such is not the case here; this Court has already found that Ward's rights to be free of excessive force regarding the first, third, and fourth segments of the encounter were all clearly established as of the date of his arrest. (*See supra* at 26–29). Therefore, the causation issue discussed in *Stewart* is not present. East Cleveland Defendants advance no other arguments related to Ward's failure-to-train claim.

Under these circumstances, a reasonable jury could find that the City and Chief Gardner's failure to train police officers was the moving force behind Ward's injuries. Along with the rights at issue being clearly established, there is nothing before the Court to suggest that the City's police officers receive training that would have prevented the constitutional violations Ward suffered; in fact, Commander Carroscia's testimony suggests that there may be little to no officer training on use-of-force, and his tacit approval of the Officers'/Foti's unconstitutional conduct (referring to it

as "pretty much textbook" at his deposition) during Ward's arrest indicates a lack of  use-of-force training from the top down.  (*See* ECF No. 50-3, PageID #1076).

At the same time, this evidence, viewed in the light most favorable to the nonmovant, does not confirm that the Officers and Foti were improperly trained or not trained at all.  The Court finds this evidence is thus more properly evaluated by a jury.  *See, e.g.*, *Hicks v. Scott*, No. 1:16-CV-621, 2023 WL 3171675, at *7 (S.D. Ohio Mar. 31, 2023) (denying a plaintiff's summary judgment motion concerning *Monell* liability on a failure to train theory when the plaintiff relied mainly on depositions from two officers who said they were not trained on the constitutional violation in the underlying dispute).  Moreover, the instances of alleged officer misconduct incorporated into Wards Motion in support of his failure to train claim are not sufficient for the Court to affirm they reflect a pattern of factually similar conduct.  (ECF No. 50-6, PageID #1152).  Genuine issues of material fact remain for trial as to Ward's failure-to-train claim.

### F.    State Tort Claims

#### 1.    *Assault and Battery*

Given the Court's holding that Officers and Foti used excessive force as a matter of law during the fourth segment of the encounter, Ward's state tort claims similarly survive East Cleveland Defendants' and Foti's Motions.  Under Ohio law, members of a political subdivision, including police officers, are generally immune from tort claims unless they act maliciously, in bad faith, or in a wanton or reckless manner.  Ohio Rev. Code Ann. § 2744.03(A)(6)(b) (West 2024).  Using more force than necessary during an arrest can give rise to tort claims of assault and battery against police officers under Ohio law.  *See D'Agastino v. City of Warren*, 75 F. App'x 990, 995 (6th Cir. 2003) (reversing summary judgment in favor of officers on excessive force claim and, consequently, assault and battery claims).

The Court's review of the video of Officers' and Foti's encounter with Ward shows that they engaged in more force than necessary in the fourth segment of the encounter.  (*See supra* at 25).  This is enough to sustain Ward's assault and battery claims as a matter of law.  *City of Cincinnati v. Nelson*, No. C-74321, 1975 WL 181750, at *2 (Ohio Ct. App. May 5, 1975) (quoting 5 O.Jur. 2d *Arrest* § 50) ("If an officer uses more force than is necessary to make an arrest and protect himself from injury, he is liable for assault and battery."); *Schweder v. Baratko*, 143 N.E.2d 486, 489 (Ohio Ct. App. 1957) (explaining that excessive force amounts to assault and battery).  Foti also pleaded guilty to assaulting Ward.  (ECF No. 50-4, PageID #1112; *see State of Ohio v. Nicholas Foti*, No. CR-23-679084-A (Nov. 27, 2023)).  That guilty plea, which admitted every element of his criminal charge, also establishes Ward's civil assault and battery claims as they relate to Foti.  *In re ClassicStar Mare Lease Litig.*, 823 F. Supp. 2d 599, 622 (E.D. Ky. 2011) (citing *United States v. Skinner*, 25 F.3d 1314, 1316 (6th Cir. 1994); *Gray v. Comm'r*, 708 F.2d 243, 246 (6th Cir. 1983)).  Ward is therefore entitled to summary judgment on Count II of the Complaint against Officers and Foti.

The City and Chief Gardner seek summary judgment regarding Ward's claim that they are vicariously liable for the assault and battery committed by Officers and Foti.  (ECF No. 31, PageID #591–92; 596–97).  Ward's Motion for Summary Judgment similarly asks for a finding that the City and Chief Gardner are vicariously liable for those intentional torts.  (ECF No. 50, PageID #1057).  Ohio law immunizes municipalities from vicarious liability resulting from intentional tort claims involving governmental functions, like police services.  *Bauer v. City of Cincinnati*, No. 1:09–cv-46, 2011 WL 5042069, at *12 (S.D. Ohio Oct. 24, 2011) (granting summary judgment in favor of municipality and chief of police, who had been sued in his official capacity, on statutory immunity grounds) (citing Ohio Rev. Code Ann. §§ 2744.01–02 (West 2024); *Thorton v. City of*

41

*Cleveland*, 890 N.E.2d 353, 355 (Ohio Ct. App. 2008)).  The City and Chief Gardner are therefore statutorily immune to Ward's assault and battery claims, and they are entitled to summary judgment regarding Count II.

### 2.  *Intentional Infliction of Emotional Distress*

Officers and Foti are also not statutorily immune from Ward's claim for intentional infliction of emotional distress.  *Jones v. City of Norwood*, No. 120237, 2013 WL 454909, at *8 (Ohio Ct. App. Feb. 6, 2013) (holding that two city officials were not entitled to statutory immunity for a claim of intentional infliction of emotional distress where there was a genuine dispute of material fact as to whether they had acted in a wanton or reckless manner, in bad faith, or with malicious purpose).  To succeed on this claim, Ward must prove that (1) the defendant had reason to know that his actions would result in serious emotional distress; (2) "the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community"; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure."  *Lombardo v. Mahoney*, No. 92608, 2009 WL 3649997, at *1 (Ohio Ct. App. Nov. 5, 2009).  "Only the most extreme wrongs, which do gross violence to the norms of a civilized society, will rise to the level of outrageous conduct." *Id*. at *2.  Generally, a plaintiff must show more than malice to succeed on such a claim; a proper claim for intentional infliction of emotional distress "is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id*. (citing *Yeager v. Loc. Union 20*, 453 N.E.2d 666, 671 (Ohio 1983), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007) (quoting Restatement (Second) of Torts § 73 (Am. L. Inst. 1965))).

42

Ward has not asked the Court for summary judgment on this claim; East Cleveland Defendants and Foti, however, argue that they are entitled to summary judgment on qualified immunity grounds.  Both Foti and East Cleveland Defendants argue that they are entitled to immunity because Ward failed to specifically allege in his Complaint that their acts or omissions were with malicious purpose, in bad faith, or in a reckless manner.  (ECF No. 31, PageID #593; ECF No. 49, PageID #923).  The Court rejected this argument in its Order concerning East Cleveland Defendants' earlier Motion to Dismiss.  (ECF No. 15, PageID #293).  It rejects that argument again here, for the same reasons.

Ward does not address (and thus seemingly abandons) this claim in his response to East Cleveland Defendant's and Foti's Motions for Summary Judgment.  Yet, neither East Cleveland Defendants nor Foti point to facts in the record even suggesting that Officers and Foti acted without malicious purpose, in good faith, or in a prudent manner; nor could they, given this Court's finding of excessive force.  (ECF No. 31; ECF No. 34; *see supra* at 25).  On summary judgment, it is the movants who bear the burden of proof, and they have produced no supporting documents to meet that burden.

Foti's self-serving statements in his Affidavit—that he never acted "outside policy from or training [he] received by the City" and that he "followed the reasonable officer standard" in conjunction with this arrest (ECF No. 49-1, PageID #926)—do little to establish a lack of malice; not only did Foti plead guilty to assaulting Ward, but this Court held that the force he used against Ward was excessive as a matter of law.  (ECF No. 50-4, PageID #1112; *see State of Ohio v. Nicholas Foti*, Cuyahoga C.P No. CR-23-679084-A (Nov. 27, 2023); s*ee supra* at 25).  Genuine disputes of material fact remain with regard to Ward's claim for intentional infliction of emotional distress.

VI.     **CONCLUSION**

In summary, for these reasons, Foti's Motion to Strike Exhibit A from Ward's Motion for Summary Judgment (ECF No. 56) is **DENIED**.  Ward's Motion to Strike (ECF No. 59) East Cleveland Defendants' Renewed Motion for Summary Judgment (ECF No. 54) is **GRANTED**.

The Court further holds that the issues below are resolved on summary judgment:

1.  **Regarding Count I**, Fourth/Fourteenth Amendment: Unreasonable and Excessive Force under 42 U.S.C. § 1983 against Officers and Foti:

    a.  Officers and Foti are entitled to qualified immunity with regard to their actions during the second segment of the encounter.

    b.  Ward is entitled to summary judgment with regard to Officers' and Foti's conduct during the fourth segment of the encounter, which was excessive as a matter of law.

2.  **Regarding Count II**, Assault and Battery against Officers and Foti, Ward is entitled to summary judgment for Officers' and Foti's assault and battery during the fourth segment of the encounter.

3.  **Regarding Count II**, Assault and Battery against the City and Chief Gardner, these defendants are entitled to statutory immunity under Ohio Rev. Code Ann. § 2744.02 (West 2024), and Ward's Motion for Summary Judgment is denied.

4.  **Regarding Count IV**, Failure to Intervene under 42 U.S.C. § 1983 against Officers and Foti, Ward is entitled to summary judgment as a matter of law.

Finally, genuine disputes of material fact remain for trial with regard to:

1.  **Regarding Count I**, Fourth/Fourteenth Amendment: Unreasonable and Excessive Force under 42 U.S.C. § 1983 against Officers and Foti, genuine issues of material

fact remain as to whether Officers and Foti used excessive force during the first and third segments of the encounter.

2.  **Count III**, Intentional Infliction of Emotional Distress against Officers and Foti.

3.  **Regarding Counts V and VI**, *Monell* Liability against the City and Chief Gardner, genuine issues of material fact remain as to whether the City and Chief Gardner are liable to Ward under *Monell*.

**IT IS SO ORDERED.**

**Date: March 27, 2025**

_____
**CHARLES E. FLEMING**
**U.S. DISTRICT COURT JUDGE**